UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 24-CR-10132-IT |
| | ) | |
| SEAN PALMER | ) | |

## <u>SENTENCING MEMORANDUM ON BEHALF OF SEAN PALMER</u>

*I.    Introduction*

Sean Palmer comes before the Court for sentencing following his plea to the one count Indictment charging him with damaging or attempting to damage a building by means of fire and an explosive in violation of 18 USC § 844(i). Mr. Palmer entered into a plea agreement with the government pursuant to Rule 11(c)(1)(C) which includes a sentence of incarceration for 60 months followed by 36 months of supervised release. Such sentence represents a guideline sentence for Mr. Palmer and one which exceeds the applicable advisory guideline range of imprisonment of 33-41 months were there no statutorily required sentence.

Though not rising to the high standard of an affirmative defense under 18 USC § 17, Mr. Palmer's mental functioning at the time he committed the conduct in this offense was obviously impaired. In sum, he acknowledges he knew at the time what he was doing was wrong, but nevertheless felt "Elohim" calling him to "…fight crybaby Satan, but want me to make hard effort so no one dies."[1] Following his incarceration in this case, Mr. Palmer was prescribed and accepted medication to address his significant mental health diagnoses. PSR ¶60. Those medications have helped his thinking in a way not present in the early morning hours of April 8,

---

[1] Excerpt of note left at the scene of the Satanic Temple. Among other things, the note also explicitly addresses "Satan" telling him that his "…music company sucks and you music sucks too."

2024. PSR ¶61. Mr. Palmer wants to continue to engage in mental health treatment upon his release and never again return to confinement.

For the reasons articulated below the Court should impose the parties' agreed sentence as one that is sufficient but not greater than necessary given the circumstances of this case, and one which appropriately balances the factors which the Court must consider when imposing a sentence.

II.     *Mr. Palmer's Background and Characteristics*

Mr. Palmer had notable trauma in his childhood that ultimately blossomed into mental health struggles in adulthood. His emerging symptoms would not fully manifest until the breakdown of his marriage. The loss of that relationship became devastating to his mental outlook, and he deteriorated further still, unmedicated, until ultimately completing this crime far away from home.

Mr. Palmer grew up in a middle-class upbringing with his parents and siblings in Tulsa, Oklahoma in the 1980's. Outwardly, his family appeared stable – his father worked for Lockheed and his mother was a therapist. But his childhood was marked with significant physical abuse by his father. PSR ¶44. His father used his fists or belts primarily, but Mr. Palmer has a clear recollection of his father tossing him as a child and striking his head against an armoire. Of this abuse, his mother's letter to the court euphemistically writes, "His father is alcoholic and was often difficult to live with before our divorce." Ex. A at 2.

As an adolescent, the family relocated to Austin, Texas for his father's work. This move proved temporary for Mr. Palmer and his mother and siblings. After about one year, his parents divorced and his mother moved them back to Tulsa while his father remained in Austin. Expectedly, the family struggled financially in the aftermath of the divorce. His mother notes

2

that Mr. Palmer struggled in school despite his intelligence, and he obtained his GED in 1995 rather than graduate on time. He would go on to complete multiple semesters at Tulsa Community College before attending Oklahoma State University to study zoology. He did not earn his degree, dropping out because of uncertainty about what he wanted to do in life (according to his mother's report, this coincided with academics becoming more rigorous).

As an adult, Mr. Palmer found work primarily in restaurant positions and in a dive shop in Rivera Beach, Florida. At the same time, his mental health struggles appear to have begun to manifest themselves (albeit not as profoundly as around the time of this incident). Beyond the effect of childhood trauma, Mr. Palmer and his mother both highlight the stillbirth of his child when he was just nineteen as a lasting emotional trauma. His mother notes he had fallen in love and was engaged to the mother. Though young and inexperienced, both were eager to welcome the baby, only to suffer the crushing loss at the end of the pregnancy. The tragedy "tore them apart and they went their separate ways." Ex. A at 2. It remains a deep trauma for Mr. Palmer, even all these years later.

In the aftermath of this heartbreak, Mr. Palmer himself fell quickly into alcoholism and substance misuse. Having first drank alcohol at age 15, Mr. Palmer reported to the probation department that his use was daily in his 20's and lasted through the next 20 years. At the same time, he used marijuana daily as well as at times other non-prescribed substances. His substance misuse continued through the other seminal relationship of Mr. Palmer's life – that of his marriage in 2018 until his separation in 2021. The couple began their relationship in approximately 2015. Mr. Palmer worked as a bartender and she was a pastor. The two moved to rural mid-Missouri in 2017 when she accepted a position there as pastor of an evangelical Disciples of Christ affiliated church in Jefferson City. Seeking new opportunities, they moved to

Florida in 2020 until his wife left in 2021, saying she no longer loved him. Devastated, Mr. Palmer returned to Oklahoma and continued holding out hope that his wife would return. His now ex-wife began seeking a divorce in early 2024, close in time to his commission of the offense in this case. Mr. Palmer's mother recounts significant deterioration in Mr. Palmer's mental health and increasingly disturbing symptoms once divorce proceedings started and laments him not receiving an antipsychotic prescription then.

Diagnosed with multiple disorders, Mr. Palmer is now stable in his prescription and actively engaged in biweekly counseling. PSR ¶60. He acknowledges both the need and enormous benefit of his treatment regimen, referring to the medication "a lifesaver." PSR ¶61 He remains close to his mother, talking to her daily since his confinement. His mother and sister attest to their interest in supporting his return to the community in Oklahoma upon his completion of service of the period of incarceration in this case.

### III.  The Offense Conduct

The offense is accurately described in the presentence report. The Satanic Temple ("TST") occupies a converted Victorian-style home along a main road in Salem. One could forgive the casual observer – particularly someone with an overtly and engaged Christian outlook – for taking from its name an understanding that TST and its members espouse devotion to or worship of the biblical Satan; or more succinctly, evil in opposition to God. Only by navigating through TST's website, however, would one better learn about its espoused belief structure and what TST means to convey by reference to "Satan". For example, in answer to the question "Do You Worship Satan?", one finds the answer:

> No, nor do we believe in the existence of Satan or the supernatural. The Satanic Temple believes that religion can, and should, be divorced from superstition. As such, we do not promote a belief in a personal Satan. To embrace the name Satan is to embrace rational inquiry removed from supernaturalism and archaic tradition-based superstitions. Satanists

should actively work to hone critical thinking and exercise reasonable agnosticism in all things.[2]

This nuance can understandably still be lost even on those who take the time to review it. Most persons' understanding of TST's position and beliefs are likely to come from media exposure of TST's own vigorous litigation against local government actions it views as violating the First Amendment's prohibition of the establishment of religion[3] and other public advocacy by TST designed to garner media attention to its perspective.[4]

---

[2] *See* "Frequently Asked Questions", The Satanic Temple, available at: https://thesatanictemple.com/pages/faq (Last accessed May 28, 2025). Similarly, in answering "What Does Satan Mean to TST?", one finds: "Satan is a symbol of the Eternal Rebel in opposition to arbitrary authority, forever defending personal sovereignty even in the face of insurmountable odds. Satan is an icon for the unbeloved will of the unsilenced inquirer – the heretic who questions sacred laws and rejects all tyrannical impositions. Our metaphoric representation is the literary Satan best exemplified by Milton and the Romantic Satanists from Blake to Shelley to Anatole France." Id.

[3] *See e.g.,* The Satanic Temple, Inc. v. City of Boston, MA, 111 F.4th 156 (1st Cir. 2024)(Affirming, *inter alia*, summary judgment against TST in their First Amendment suit challenging Boston City Counsil's refusal through its mechanism of choosing speakers to invite TST to give an invocation at the start of council meetings) ; The Satanic Temple, Inc. v. Rokita, et al., 22-cv-01859-JMS-MG (SD In, 2022)(Unsuccessful challenge to Indiana abortion prohibition scheme as violating among other things the Indiana Religious Freedom Restoration Act by prohibiting TST from supplying to its members via mail-order drugs for its members in Indiana to have abortions while performing TST's "Satanic Abortion Ritual".); The Satanic Temple v. City of Belle Plaine, Minnesota, et al., 0:21-cv-00336-WMW-JFD (D. Mn, 2021)(Unsuccessful challenge to the City of Belle Plaine's actions in granting permission to TST and another group to place monuments in Veterans Memorial Park where a Veterans club placed a statue of a soldier kneeling before a cross in the park and community objection over TST receiving permission for its display led the City to rescind all permits, causing the removal of the soldier statue and TST's monument to never be displayed); The Satanic Temple, et al. v. City of Scottsdale, et al., 856 Fed.Appx. 724 (8th Cir. 2021)(Affirming judgment for Scottsdale in TST's suit challenging the city's recission of permission for TST to give invocation at council meeting where decision was not based on discrimination against TST for its religious views or identity).

[4] *See* Richard Hall, "Satanic Temple opens online abortion clinic named after Samuel Alito's mother", The Independent, February 15, 2023, available at: https://www.independent.co.uk/news/world/americas/the-satanic-temple-abortion-clinic-samuel-alito-b2282495.html (Last accessed May 28, 2025)(Covering TST's announcement of its establishment of a telehealth service in New Mexico named "The Samuel Alito's Mom's Satanic

TST clearly seeks legal and official recognition as a "bona fide religion entitled to equal treatment under the law" and an entity of "sincere religiosity."[5] The parties – by virtue of their agreed-upon guidelines calculation – explicitly endorse a three-level increase under U.S.S.G. § 3A.1.1(a) where Mr. Palmer admits that TST was intentionally selected as the object of his offense because of its religion. *See* ECF No. 38, ¶ 4(b); PSR ¶26.

No matter its belief structure or name, no excuse or justification can be made for the aggression and dangerousness of Mr. Palmer's conduct, and none is offered here. His conduct was hazardous to himself and others in significant ways. For its part, the advisory guidelines which apply here take presumptively adequate account of the specially targeted nature of his conduct. But in accounting for that criminal conduct as part of arriving at a just sentence which is sufficient but not greater than necessary, it is still important to understand Mr. Palmer's frame of understanding at the time and the influence of his own misguided hyper-religiosity and mental health struggles on his conduct.

---

Abortion Clinic" which planned to offer screenings and appointments and abortion medication for patients who want to take part in its 'religious abortion ritual', quoting a TST co-founder stating, "In 1950, Samuel Alito's mother did not have options, and look what happened."); *and also,* Helen Lewis, "A Satanic Rebellion: Social justice collides with the Satanic Temple", The Atlantic, October 1, 2023, available at: https://www.theatlantic.com/ideas/archive/2023/10/social-justice-rebellion-satanic-temple/675481/ (Last accessed May 28, 2025)(The article begins: "The last time Lucien Greaves got into this much trouble over a photograph, he had his genitals out. In July 2013, Greaves gained nationwide media attention for resting his scrotum on the gravestone of the Reverend Fred Phelp's mother – a stunt designed to protest the homophobia of the Westboro Baptist Church, an ultra-conservative group that was then regularly featured on the news. Greaves was trading offense for offense. Phelp's church had a habit of protesting soldiers' funerals with placards telling gay people that they were going to hell. So Greaves claimed to have performed a 'Pink Mass' that turned the mother of Westboro's patriarch gay in the afterlife.").

[5] *See e.g.,* The Satanic Temple, Inc. v. City of Boston and Michelle Wu, 1:25-cv-11024-AK (D. Mass. 2025)(Pending suit alleging violations of free speech and exercise, and establishment clause and seeking, *inter alia*, an injunction requiring Boston to fly the TST flag after flying a Christian flag).

IV.  *The Parties' Agreed Upon Sentence Properly Accounts for the 3553(a) Factors*

   a. *Nature and Circumstances of the Offense*

Mr. Palmer's offense and the circumstances surrounding it are described above and in the presentence report. Surrounding a time of mental health struggles and trauma resulting from the impending divorce proceedings, he traveled half-way around the country to commit a serious criminal offense in the dead of the night. The offense requires a serious term of incarceration as a component, and the parties' agreed upon sentence adequately considers the nature and circumstances of Mr. Palmer's offense of conviction.

   b. *History and Characteristics of Mr. Palmer*

Mr. Palmer has endured significant traumas in his life, but has the support of his family who recognize his serious mental health needs and are engaged in getting him appropriate care. He comes before the Court with a history of steady employment. He is motivated to remain actively engaged in his mental health and has a history of taking his prescribed medication because he acknowledges it to be a "life saver" for him. Mr. Palmer's history and characteristics suggest no greater period of incarceration is reasonably necessary and that equally if not more important will be crafting appropriate conditions of supervision which have been suggested by probation.

   c. *Just Punishment and Deterrence*

The parties' agreement likewise satisfactorily accounts for imposition of a just punishment and adequate deterrence. The agreed upon terms represent a serious sentence under the circumstances of this case with this defendant. No greater period is necessary to deter Mr. Palmer from similar conduct in the future. This is the most significant period of incarceration he has ever experienced, and one which comes far removed from the familiarity of where he is

from. Similarly, no greater term is necessary to impart to others that no matter the circumstances present – or that they believe exist – acting similarly will be met with significant punishment and lasting consequences.

### d. Avoiding Unwarranted Sentencing Disparities

The presentence report notes that there are an insufficient number of cases within the last four years for the Judiciary Center Information (JSIN) data set from which to compare average and median sentences for defendants with a similar primary guideline and offense level as Mr. Palmer. PSR ¶92. Notably, the otherwise applicable advisory guideline is lower than the parties' recommended sentence by virtue of the statutorily required sentence of incarceration, suggesting no likelihood of the parties' sentence representing any unwarranted sentencing disparity. And a cursory review of sentences imposed in other Districts suggests likewise. *See* United States v. Raymond Garland, 1:23-cr-00156-RP-1, "Government's Sentencing Memorandum" ECF No. 44 (W.D. Tx. 2023)(30 month sentence imposed where home-made pipe bomb detonated apparently accidentally in hospital parking lot and defendant was on probation at the time and asked loved ones to remove evidence in the aftermath.); United States v. Joshua Rickey, 4:22-cr-00600-JAR, "Guilty-Plea Agreement" ECF No. 35 (E.D. Mo. 2022)(6 year sentence where defendant was believed to have constructed 5 pipe-bombs at home, had thrown one in an abandoned building near his home setting it alight, set another off outside his grandmother's house causing damage to a fence, and allegedly menaced a fiancée with another); United States v. Anibal Castro, 5:22-cr-00054-gwc, "Affidavit" ECF No. 1-1 (D. Vt. 2022)(Police discovered pipe bomb during execution of search warrant related to shooting, where tube was filled with pellets and wrapped in black tape with the words "Bye Bye!!" written on it, and defendant admitted to making other devices and detonating them, including in bodies of water in Rhode Island.); United States v. Jim

Lanier, 3:23-cr-30060-DWD, "Government's Sentencing Memorandum" ECF No. 36 (S.D. Ill. 2023)(41-month sentence for defendant who threw an explosive device at individuals who were confronting a suspicious person walking in trailer court where defendant had reportedly been looking for his wife and her vehicle.); United States v. Scott Anderson, et. al, 1:23-cr-00096-WQH-BAM (E.D. Ca. 2023) "Plea Agreement" ECF No. 86 (Sentences of 36 months for co-defendants who made and detonated devices inside mailboxes and automobiles at multiple locations in Fresno, California where the explosions resulted in fires that caused damage). Considering sentences such as these, the Court can conclude that imposition of the parties' agreement will not result in any unwarranted sentencing disparity.

V.     Restitution

Under the Mandatory Victims Restitution Act ("MVRA"), restitution is mandatory. *See* 18 U.S.C. § 3663A. The "government bears the burden of demonstrating a proximate, but-for causal nexus between the offense of conviction and the actual loss," and it "must carry this burden by a preponderance of the evidence." *Id.; see also* 18 U.S.C. § 3664(e). Generally, expenses may qualify for restitution if they would not have been incurred in the absence of the offense, were not too attenuated in fact or time from the crime, and were reasonably foreseeable. United States v. Chan, 981 F.3d 39, 65 (1st Cir. 2020). *Cf.* United States v. Corey, 77 Fed.Appx. 7 (1st Cir. 2003)(Unforeseeable consequential damages are beyond the scope of the MVRA). In cases of pecuniary loss, the MVRA "only reaches monetary losses that a victim has actually sustained." United States v. Padilla-Galarza, 990 F.3d 60, 92 (1st Cir. 2021). Where, as here, an offense results in damage to a victim's property, the order of restitution shall require the defendant to "pay an amount equal to – (i) the greater of the value of the property on the date of the damage, loss, or destruction; or the value of the property on the date of sentencing[.]" 18

9

U.S.C. § 3663A(b)(1)(B)(cleaned up). Restitution may also be ordered for a victim's "lost income and necessary child care, transportation, and other *expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense*." 18 U.S.C. § 3663A(b)(4) (emphasis added).

In this case, the presentence report notes that "[n]o costs were incurred because of the minor damage to The Satanic Temple" and the "parties have agreed that restitution will not exceed $10,000." PSR ¶88. On May 28, 2025, the government informed the probation department and Mr. Palmer that TST seeks an order of restitution in the amount of $27,838 for three distinct categories of expenses. The presentence report notes the government's objection to the draft report. PSR p. 22-23. The probation department concludes that it, "does not believe that the costs and losses listed above meet the requirement for mandatory restitution." PSR p. 23. Citing the plea agreement, it notes that 18 USC §3553A(a)(3) provides for restitution if agreed to by the parties in a plea agreement.[6] Importantly, in discussions prior to the plea agreement and after the TST submission, the government acknowledged to Mr. Palmer that the restitution requirement of the plea agreement as drafted does not preclude disagreement with whether claimed expenses are allowable as restitution. Mr. Palmer anticipates that the government will maintain this position – that he remains able to object to what he believes is not properly restitution – but anticipates the government to also maintain that the requested categories submitted by TST fall within the ambit of restitution under the MVRA.

As set forth below, Mr. Palmer submits that the documentation provided by TST and the government lack sufficient detail, corroboration, and attestation to support the requested

---

[6] The parties' agreement states as part of the agreed disposition, "(e) full restitution to all victims, not to exceed $10,000." ECF No. 38 at 3.

restitution orders. Where these expenses were neither necessary nor reasonably foreseeable and are not directly related to and/or are attenuated from his offense, Mr. Palmer submits that the specific requested restitution is not permitted under the MVRA.

      a. *Purchase of K9*

TST seeks restitution in the amount of $20,000 for the purchase of a "protection K9" for its co-founder and public spokesperson, Lucien Greaves. This figure purports to cover the "acquiring, training, and maintaining [of] the protection K9" which it obtained "to ensure Lucien's safety during public appearances and daily operations." *See* Gov Obj. to PSR. It is not clear, in the first instance, that a K9 was actually required to ensure either TST's daily operations or Mr. Greaves' future public appearances. Additionally, neither the costs associated with the K9 nor Mr. Greaves' continued public appearances are foreseeable or directly related to Mr. Palmer's criminal offense. These expenses are therefore outside the ambit of the MVRA and should not be considered as appropriate restitution matters here.

More importantly, however, where the purchase and care of a K9 to support Mr. Greaves do not involve expenses "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense," restitution is not appropriate. Specifically, expenses related to the purchase, training, and maintenance of a K9 are not "necessary" within the meaning of 18 U.S.C. § 3663A(b)(4) nor are they related to any *government investigation or proceeding* and are thus not appropriately considered for restitution. *See* Lagos v. United States, 584 U.S. 577 (2018)(Reversing restitution order for costs associated with private investigating undertaken by victim, notwithstanding the sharing of the fruits of such investigation with the government); United States v. Koutsostamatis, 956 F.3d 301 (5th Cir. 2020)(Vacating restitution order and finding that "other expenses" authorized under 18 U.S.C. §

3663A(b)(4) must be similar to the MVRA's enumerated expenses of "lost income and necessary child care, transportation"); United States v. Maynard, 743 F.3d 374 (2d Cir. 2014)(Same, expenses other than those enumerated in MVRA are not compensable and vacating restitution order for, *inter alia*, victim's hiring of temporary security guard). Indeed, TST's request for reimbursement for K9 costs appear to be wholly unrelated to expenses required to attend or participate in any government investigation, proceeding, or appearance.

Additionally, where it appears that TST seeks the total cost associated with the K9 ($20,000), such an award would be inappropriate and effectively subsidize Hurricane Creek K9 LLC's $10,000 donation to TST. *Id.* The receipt submitted by TST for the K9 notably makes no mention of the purported total $20,000 cost, nor the purported $10,000 donation or reduction from the total cost. On this basis alone, the evidence submitted to support this claim is insufficient.

    b. *Property Insurance Increase*

Next, TST seeks restitution in the amount of $6,658 for property insurance, as it represents that following the offense in this case, TST's previous insurer declined to renew coverage, requiring TST to seek out a new policy with additional coverage.[7]

In the first instance, the Court should note that the documentation provided does not name TST as the insured party, but rather the prior policy names "Sixty Fourt Bridge, LLC DBA Salem Art Gallery" as the insured; the apparently current policy names, "Sixty Four Bridge, LLC". The Secretary of the Commonwealth's publicly accessible Corporations Division

---

[7] TST's submission suggests that this is a yearly, ongoing cost and that the $6,658 figure represents the increase on the annual policy cost from its previous coverage. To the extent that TST seeks a restitution order covering future annual insurance policy costs, Mr. Palmer objects and reserves his rights to seek additional discovery material relating to this matter.

database includes filings for "Sixty Four Bridge, LLC", which makes no reference to TST and describes the "general character of business" as, "acquire, manage and operate real estate along with all lawful other business in the Commonwealth." Ex. B at 2-5. TST is separately organized with the Secretary of the Commonwealth as "The Satanic Temple, Inc." whose purpose is noted as, "…to engage in the following activities: A) the promotion of the beliefs, ideals, and tenets of the religion. B) mutual support and assistance of the religion's members. C) holding religious events and ceremonies. D) interaction with the communities within which the church has a presence. E) to engage in such other activities consistent with the operation of a non-profit church as described by Section 501(C)(3) of the Internal Revenue Code or corresponding section of any future Federal Tax Code." Ex. B at 6-10.

Importantly, according to the publicly available records of the Southern Essex Registry of Deeds, the building which is the subject of the criminal charge – 64 Bridge Street in Salem – is not owned by TST, but rather by "64 Bridge LLC". The most current mortgage, a mortgage discharge, and a quitclaim deed held by the registry all refer to "Sixty Four Bridge, LLC" as the interested party, not TST. Ex. B at 11-23, 24, and 25. The most recent filings relate not to TST as owning the property; rather Tesla, Inc. asserts a secured interest in energy generation systems against "64 Bridge Llc" and a named individual in the Secretary of the Commonwealth filings for the LLC who is not Mr. Greaves. Ex. B at 26-27. Presumably, Sixty Four Bridge, LLC leases the property to either "Salem Art Gallery"[8] (as named in the Union Mutual documentation) or TST itself. Even if the increase in policy cost were an allowable form of restitution (and Mr.

---

[8] The Secretary of the Commonwealth's database contains no record using the search term "Salem Art Gallery". Ex. B at 28.

Palmer does not concede that it is), the request submitted by TST fails to show its own obligation for restitution it claims.

What's more, however, the government has provided no documentation substantiating reason for the declination of the previous insurer (Union Mutual) to renew this policy, let alone any documentation of TST's claim that the declination was related in any way to Mr. Palmer's offense. Moreover, to the extent that TST asserts additional coverage by a new insurer was required to provide terrorism-related coverage whereas the previous policy had not, the documentation provided by TST related to its 2022-2023 policy with Union Mutual explicitly included "federal terrorism coverage." *See* Gov Obj. to PSR. Finally, the documents provided by TST via the government do not indicate the new insurer's assessment of Mr. Palmer's offense in its estimate or issuance of a new coverage policy (as opposed to other threats which others have made against TST), nor is there any substantiation of TST's claim that no cost-comparable insurance from traditional insurers could be obtained as a result of Mr. Palmer's offense. On this record, where the government appears to have merely passed along TST's unsupported cost estimate, it cannot meet its burden to demonstrate loss, causation, or the reasonableness of this request. *See e.g.,* United States v. De Jesus-Torres, 64 F.4th 33, 44 (1st Cir. 2023)("Causation cannot simply be assumed"); United States v. Steele, 897 F.3d 606 (4th Cir. 2018)(Vacating restitution order where government relied on victim's unsupported estimate of loss and replacement costs, and finding that district court abused its discretion by accepting victim's proffer of loss that was not based on fair market value).

      c. *Reimbursement for Staff Member's Pet-sitting*

TST also seeks restitution in the amount of $1,180 related to the pet-sitting fees incurred by an employee who "was required to make an emergency trip to Salem to temporarily assume

14

the Gallery Manager's responsibilities." The sole documentation supporting this request appears to be a PayPal transfer from TST to the employee with a note referencing a "boarding invoice." The government has not provided any materials or documentation relating to the boarding of the employee's pet, nor any substantiation that such boarding or pet-sitting was "necessary" or covered as an "other expense" related to TST's participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. 18 U.S.C. § 3663A(b)(4) and Lagos, 584 U.S. 577. As with its submission relative to the insurance policy claim, a pass-on claim is insufficient to satisfy the government's burden.

Finally, and with respect to the determination of a reasonable restitution award, although 18 U.S.C. § 3664(f)(1) forbids "consideration of the economic circumstances of the defendant," it is appropriate to consider a defendant's future earning capacity in setting restitution. United States v. Salas-Fernandez, 620 F.3d 45, 49-50 (1st Cir. 2010). As noted in the presentence report, Mr. Palmer has no assets or income, and his future incarceration given the parties' joint and binding sentencing recommendation makes virtually certain that he will not obtain meaningful assets or income during his imprisonment. PSR ¶ 75. As Mr. Palmer serves his sentence, he may be eligible for institutional work within the Bureau of Prisons, where he would earn cents on the dollar if selected. His physical medical issues which are described in the presentence report also likely impact his ability to work both within BOP and meaningfully once released.

    d. *Request Regarding Accrual of Interest*

If the Court determines that any of the sought amounts are properly chargeable as restitution against Mr. Palmer, he respectfully requests that the Court specifically order that any interest on that restitution obligation not accrue while he remains incarcerated serving the

sentence in this matter. Such request is justified by his limited financial means, and lack of any reasonable earning capacity in the Bureau of Prisons.

VI.   *Request for Recommendation to Bureau of Prisons for Designation to MCFP – Springfield, Missouri*

Mr. Palmer requests that the Court specifically recommend in its Judgment that the Bureau of Prisons designate Mr. Palmer to serve his sentence at the Medical Center for Federal Prisoners (MCFP) – Springfield. MCFP – Springfield is an administrative security federal medical center located in Springfield, Missouri. Such recommendation would be appropriate in light of the medical and psychiatric concerns noted in the presentence investigation report. *See* PSR ¶¶ 52, 53, 54, 56-61. Designation to that facility would also permit consistent visitation with Mr. Palmer's family in Oklahoma.

VII.   *Conclusion*

For all the foregoing reasons, the Court should accept the parties' agreement regarding sentencing and impose the 60-month term of incarceration to be followed by 36-months of supervision under the conditions suggested by the probation department. The Court should decline to impose the restitution sought for the reasons discussed. Finally, the Court should recommend to the Bureau of Prisons that Mr. Palmer be designated to MCFP-Springfield for service of the sentence.

Respectfully submitted,

SEAN PALMER

By:   /s/ *Brendan Kelley*
Brendan Kelley
Assistant Federal Public Defender
51 Sleeper Street, 5th Fl.
Boston, MA 02210
617-223-8061

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 5, 2025.

                                            */s/ Brendan Kelley*
                                            Brendan Kelley